UNITED STATES of America ex rel. Alvin R. DREW, Appellant,

v.

David N. MYERS, Superintendent, State Correctional Institution, Graterford, Pennsylvania.

No. 14400.

United States Court of Appeals Third Circuit.

Argued Oct. 18, 1963.

Decided Jan. 23, 1964.

Rehearing Denied Feb. 24, 1964.

**176**

Martin Heller, Philadelphia, Pa., for appellant.

Burton Satzberg, Asst. Dist. Atty., Philadelphia, Pa. (Arthur J. Marion, Asst. Dist. Atty., Arlen Specter, Asst. Dist. Atty., Chief, Litigation Division, F. Emmett Fitzpatrick, Jr., First Asst. Dist. Atty., James C. Crumlish, Jr., Dist. Atty., Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

 This is an appeal by Alfred W. Drew from the denial of his petition for a writ of habeas corpus by the United States District Court for the Eastern District of Pennsylvania.[1] The following pertinent facts and circumstances are gleaned from a stipulation [2] filed in the District Court by counsel for Drew and the Commonwealth of Pennsylvania.

---

1. United States ex rel. Drew v. Myers, 214 F.Supp. 455 (E.D.Pa.1963).

2. The stipulation was submitted in lieu of the transcript of Drew's trial in the Philadelphia Court of Common Pleas. Its purpose was to eliminate the necessity for calling a great number of witnesses. While the stipulation was adequate, the better practice dictates that the transcript be available notwithstanding the submission of a stipulation. In this connection the comment of Judge Chesnut is particularly cogent:

"We doubt the advisability of the practice followed in this case of stipulating in a habeas corpus case the contents of the transcript of record of another court. When one district court of the United States reviews on habeas corpus the judgment of another court of equal dignity, it would seem important that the reviewing court should act only on the record itself and not merely on a stipulation of counsel as to the contents of that record. * * * The review and reversal by the habeas corpus court of the trial court of equal dignity is a matter calling for great circumspection and care. And where the supposed constitutional defect in the trial is necessarily included in the record of the criminal case, it would seem that requisite care would require the production of a transcript of the record. * * *" Sunal v. Large, 157 F.2d 165, 172 n. 4 (4 Cir. 1946), aff'd 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982, reh'g den'd 332 U.S. 785, 68 S.Ct. 29, 92 L.Ed. 368 (1947), reh'g den'd 333 U.S. 877, 68 S.Ct. 895, 92 L.Ed. 1153 (1948).

On January 29, 1958, Drew was arrested in Philadelphia for the illegal possession and sale of narcotics on September 5, 1957. He was indicted therefor on February 11, 1958, in the Philadelphia Court of Common Pleas.

On February 15, 1958, Drew retained counsel, who unsuccessfully attempted to contact Thomas Sherwood, an alleged alibi witness. He would establish, purportedly, that Drew was in New York on the date of the crime.

On February 15, 1958, Drew's counsel received notice that the trial was set for Wednesday, March 5, 1958. Before the selection of the jury on that date, Drew's attorney moved for a continuance on the ground that he lacked adequate time to prepare his case. He further advised the Trial Court that Drew's defense would be alibi, but that his attempts to contact Sherwood, as yet, had been unsuccessful.

The Trial Court denied the motion for a continuance, stating: "Well, I think you have had sufficient time to work it out and will refuse your motion."

Prior to the taking of testimony, on March 6, 1958, counsel for Drew requested the prosecution to divulge the identity of any eyewitnesses to the alleged crime not indorsed on the bill of indictment. The Commonwealth stated that there were no witnesses other than those listed on the bill of indictment.[3]

The Commonwealth's first witness was an undercover agent and police officer, named Harold Carter. He testified that on September 5, 1957, he and Irving Carter[4] were walking together in the vicinity of Broad and South Streets in Philadelphia, when they saw Drew. Irving, according to Harold, then left him to speak to Drew, after which, Irving returned to converse with Harold. Then, allegedly, Harold approached Drew from whom he purchased narcotics. The purchase occurred about ten feet from where Irving stood. Harold stated that he rejoined Irving after the transaction and together they left the scene.[5]

Following this testimony, Drew's counsel moved for a continuance for the purpose of having the Commonwealth produce Irving Carter or to permit counsel to produce him. Drew's counsel asserted that this was the first time the defense had ever heard of Irving. The Trial Court refused the motion. Counsel later renewed the motion, and again it was refused.

As the trial began on Wednesday, Drew's counsel contacted Dale Wright in New York City, asking him to locate Sherwood. On Friday, Mr. Wright advised counsel "that the address given to

---

3. The following occurred on March 6, 1958, before the various witnesses began to testify:

 "The Court: You want to know if there are any other eyewitnesses not on the bill?

 "Mr. Moore [Attorney for Drew]: Yes, sir.

 "Mr. Rosenwald [Assistant District Attorney]: We have no other witnesses to the transaction.

 "The Court: Other than those on the bill of indictment.

 "Mr. Rosenwald: That is right.

4. Irving Carter is no relation to Harold Carter.

5. The stipulation particularized the incident thus:

 "During the testimony of Harold Carter, the Commonwealth's first witness, it was established that one Irving Carter had met Harold in West Philadelphia [September 5, 1957] on the date of the alleged offense [illegal possession and sale of narcotics]. At or about the time of the offense they were both walking together in the vicinity of Broad and South Streets when they saw the relator walking east on the north side of South Street between 13th and Broad. Irving Carter is then alleged to have left Harold and approached the relator. He is then alleged to have returned to Harold and a conversation ensued. Harold Carter, an undercover agent on Philadelphia's narcotics squad, is then alleged to have approached defendant and purchased narcotics. At the time of the transaction Irving Carter was standing approximately ten feet away. There is no testimony that he actually saw the passing of the packages. After the alleged transaction Harold Carter rejoined Irving Carter and they left the scene together."

him was incorrect" but that he would continue with his attempt to locate Sherwood over the weekend. Mr. Wright testified at the habeas corpus proceeding in the District Court that he located Sherwood on Monday, March 10, the last day of the trial.

At 11:15 a. m., of that Monday, counsel for Drew stated to the Trial Court that he had just received word from New York City that Sherwood had been located but was reluctant to go to Philadelphia. He expressed the thought, however, that the "witness might be in by 2:00 o'clock." The trial judge then stated: "If he is here by 2:00 we will take his testimony, otherwise there will be no more witnesses."

After the noon recess, counsel again made a motion for continuance to obtain the testimony of Sherwood. To demonstrate the "bona fides" of the motion, Drew claims, counsel then introduced a statement of a "telephone message" from Mr. Wright, signed by counsel's secretary. It read:

"Thomas Sherwood, the witness, can be reached at University 4–1952 or University 4–9649 before 12:30 P.M.; he is a porter in Leo's restaurant at 2077 7th Avenue. He will be reluctant to come over to Philadelphia to testify on the stand because he is an ex-con and in domestic trouble with his wife. He does know that Alvin Drew was in New York from September the 1st to September 15th and specifically on September the 5th, and he does know Alvin Drew."

6. Commonwealth v. Drew, 190 Pa.Super. 478 at 481, 154 A.2d 285 at 287 (1959).

7. Drew asserts: "[H]e was unable to file an appeal to the Supreme Court of Pennsylvania because he was not personally notified of the decision of the Superior Court until after the expiration of the appeal time."

8. Commonwealth ex rel. Drew v. Myers, 23 Pa.Dist. & Co.R.2d 403, 406 (1959).

9. Commonwealth ex rel. Drew v. Myers, 194 Pa.Super. 329, 169 A.2d 126 (1961).

This motion was also denied.

Thereafter on the same day, the jury adjudged Drew guilty. He received a sentence of seven and one half to thirty years and is presently confined in the State Correctional Institution at Graterford, Pennsylvania.

Drew, represented by his counsel in the Trial Court, then appealed to the Superior Court of Pennsylvania. In affirming his conviction, it found that there was no "abuse of discretion in the refusal of the trial judge to grant a continuance" to the defense so that it could obtain the testimony of Irving Carter.[6] There was no appeal from the affirmance.[7]

Subsequently, Drew filed a petition pro se for a writ of habeas corpus in the Court of Common Pleas for Philadelphia. In dismissing his petition, it stated that "his contention that an alleged eye-witness [Irving Carter] should have been called at the time of the trial * * *"[8] was decided by the Superior Court. The Superior Court affirmed the dismissal of Drew's habeas corpus petition on the opinion of the Court of Common Pleas.[9] On June 1, 1961, in an unreported order, the Supreme Court of Pennsylvania refused allocatur.[10] The United States Supreme Court denied certiorari.[11]

On July 3, 1962, Drew filed a pro se petition for writ of habeas corpus in the United States District Court. On July 16, the District Court appointed counsel to represent petitioner.[12] An amended petition for writ of habeas corpus was filed on August 23. After conducting a full hearing, the District Court held that there was no denial of due process because of the refusal of the Trial Court

10. Shep.Pa.Cit.Supp.1956–1962, p. 219 (for 194 Pa.Super. 329, 169 A.2d 126).

11. Drew v. Myers, 368 U.S. 957, 82 S.Ct. 401, 7 L.Ed.2d 389 (1961).

12. Martin Heller, Esq. of the Philadelphia Bar was assigned in the District Court and voluntarily carried the appeal to this court. Cecil B. Moore, Esq., also of that bar, represented Drew at the trial in the Common Pleas Court of Philadelphia and in his appeal to the Superior Court of Pennsylvania.

to grant Drew's motions for continuance to obtain the testimony of Irving Carter and Sherwood, the alleged alibi witness.[13]

This appeal presents the following issue: Whether Drew was denied due process of law by the cumulative effect of (1) the Commonwealth's failure to disclose the name of an alleged essential witness, Irving Carter, (2) the Trial Court's refusal to grant Drew a continuance to obtain the testimony of an alleged essential witness, Irving Carter, and (3) the Trial Court's refusal to grant the defense a continuance to obtain the testimony of an alleged alibi witness, Thomas Sherwood. On the basis of the record before us, it is apparent that the State courts have never ruled on whether there was a denial of due process of law because of the cumulative effect of these three points. Rather, they have ruled merely on the second point independently.[14]

1. *The Commonwealth's Failure to Disclose the Name of an Alleged Essential Witness, Irving Carter.*

The prosecution concedes that Irving Carter made the contact with Drew for Officer Harold Carter, conversed with Harold immediately before the alleged illegal transaction, and was merely about ten feet away from the spot where the narcotics were purchased. Accordingly, Irving was aware of the identity of the individual consummating the alleged illegal transaction which he, indeed, had set up for Harold. Moreover, the record shows that Irving was the only witness, besides Harold, who could have identified the accused as being at the scene of the alleged illegal transaction.

 To engage in a semantic argument whether Irving fits within the definition of an eyewitness, is to provoke a needless discussion.[15] Although Irving may have been unable to see the claimed passing of the tiny narcotics package between Drew and Harold, a conclusion that he was unable to see Drew is untenable. Therefore, whether or not Irving was an eyewitness, what he saw—as it relates to the identity of the individual allegedly conducting the illegal transfer with Harold—would appear to make him an essential witness. Calling him could have elicited relevant and material facts contributing to a determination of the truth. And not only may a trial judge, as a proper exercise of his discretion, direct the prosecution to call eyewitnesses to the crime,[16] but any additional witnesses that are necessary to elicit relevant and

---

13. United States ex rel. Drew v. Myers, supra note 1.

14. See supra notes 6 to 10.

15. See note, The Failure of a District Attorney to Call Eyewitnesses in Criminal Cases in Pennsylvania, 25 Temp.L.Q. 344, 351 (1952), which expressed the view:
"Nor is there any basis for a distinction between an eyewitness and any other type of witness. The importance of a particular witness lies not in any particular classification in which he falls, but rather in the information that he possesses concerning the crime."

16. Commonwealth v. Cramer, 168 Pa. Super. 1 at 4, 76 A.2d 661 at 662 (1950).
Normally, if Irving Carter were an eyewitness, the Commonwealth should have called him to testify. Commonwealth v. Sarkis, 164 Pa.Super. 194 at 199, 63 A. 2d 360 at 363 (1949); United States v. Clarke, 220 F.Supp. 905, 908 (E.D.Pa. 1963). For the propriety of a witness,

not indorsed on the bill, to testify at trial, see Commonwealth v. Gockley, 411 Pa. 437 at 449–455, 192 A.2d 693 at 699–702 (1963) and Commonwealth v. Emmel, 194 Pa.Super. 441 at 443–447, 168 A.2d 609 at 610–612 (1961). But the prosecution has no duty to call any witness, even an eye witness, if it believes after examination or investigation that his testimony is either unreliable, surplusage, or irrelevant. Commonwealth v. Palermo, 368 Pa. 28 at 32, 81 A.2d 540 at 542 (1951); Commonwealth v. Horn, 395 Pa. 585 at 589, 150 A.2d 872 at 874 (1959). However, the Commonwealth must then properly give notice to the defendant of the decision not to call the eyewitness. Compare Commonwealth v. Deitrick, 221 Pa. 7 at 15, 70 A. 275 at 278 (1908); Commonwealth v. Horn, supra; Commonwealth v. Giacobbe, 341 Pa. 187 at 195–196, 19 A.2d 71 at 75–76 (1941); Commonwealth v. Danz, 211 Pa. 507 at 522, 60 A. 1070 at 1075 (1905); and United States v. Peterson, 24 F.Supp. 470, 471 (E.D.Pa.1938) with Common-

material facts contributing to a determination of the truth.[17] Drew, it is clear, had the right "to have all of the facts connected with the [alleged illegal possession and sale of narcotics] * * * fully and fairly disclosed by the prosecution * * *."[18]

On Thursday morning, March 6, 1958, the assistant district attorney said that there were no other witnesses to the alleged transaction other than those on the bill of indictment. This may have been inspired by the prosecution's reluctance to disclose the identity of the informer. Preserving the anonymity of persons who furnish information of law violations encourages citizens to perform their duty of communicating knowledge about commission of crimes to the proper officials.[19]

■■ Yet, even assuming that Pennsylvania recognizes the privilege [20] to withhold from disclosure the identity of persons who furnish information of law violation to officers charged with enforcement of law, it nonetheless is a limited privilege. The United States Supreme Court has held that the fundamental requirements of fairness demand that the privilege give way where the disclosure of an informer's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." [21]

When, however, the Commonwealth's first and main witness testified early Thursday morning, he told about Irving's nearness to the alleged transaction. At this moment the defense learned, gratuitously, of a witness who may have aided the Trial Court in reaching the truth. Thus, it may well be that standing by itself the Commonwealth's failure to disclose Irving Carter's presence at the scene did not violate the fundamental justice implicit in due process of law, since Drew's counsel did discover Irving's existence at an early moment in the trial. Nevertheless, the prosecution would have promoted the concepts of fair play by disclosing Irving's proximity, instead of stating that there were "no other witnesses to the transaction" in response to the inquiry. For although the prosecutor must have a large measure of discretion in presenting his case, manifestly he is a

wealth v. Sarkis, supra, 164 Pa.Super. at 199 n. 2, 63 A.2d at 363 and
Commonwealth v. Drew, supra note 6, 190 Pa.Super. at 480, 154 A.2d at 286.

17. Commonwealth v. Bready, 189 Pa. Super. 427, 150 A.2d 156 (1959). See Donaldson v. Commonwealth, 95 Pa. 21 at 24–25 (1880), where the Pennsylvania Court noted that a physician, who on the day after an alleged rape examined the purported victim, should have been called as a witness by the district attorney. It said: "Whether his evidence tended to acquit or convict it was demanded equally by the cause of humanity on the one hand, or of justice on the other." Id. 95 Pa. at 25; also, see Commonwealth v. Drew, supra note 1, 190 Pa.Super. at 481, 154 A. 2d at 287, which stated: "The Commonwealth is not required to call all witnesses to the various stages in the planning and commission of a crime but only those whose testimony is germane to the issue or whose testimony tends to get at the truth."

18. Commonwealth v. Keller, 191 Pa. 122 at 134, 43 A. 198, at 199 (1899).

19. Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); see Commonwealth v. Caplan, 411 Pa. 563 at 566–567, 192 A.2d 894, at 895–896 (1963).

20. Wigmore on Evidence, State Secret and Official Documents, Ch. 85, §§ 2374–75 (McNaughton rev. 1961); American Law Institute Model Code of Evidence, Personal Privileges, Ch. 3, Rule 230 (1942).

21. Roviaro v. United States, supra note 19, 353 U.S. at 60–61, 77 S.Ct. at 628–629, 1 L.Ed.2d 639, where it was held that it was reversible error for the trial court to refuse to order the Government to disclose the identity of an undercover informer who had taken a material part in bringing about petitioner's possession of the drugs and had been present with petitioner at the occurrence of the alleged crime. See Accused's Rights—Informer—Identity, 76 A.L.R.2d 262, 269–270 (1961), which states that the Roviaro case "has been given great weight in most state courts".

quasi-judicial officer [22] and should be motivated by a judicial attitude.[23]

### 2. The Trial Court's Refusal to Grant Drew a Continuance to Obtain the Testimony of the Alleged Essential Witness, Irving Carter.

Drew argues that because of Irving's importance and the law relating thereto, the Commonwealth should have had him available for the defendant.[24] Non-fulfillment of this obligation, coupled with the assistant district attorney's misleading statement as to the non-existence of witnesses to the crime, Drew maintains, required the Trial Court to grant a continuance so that his lawyer could have an opportunity to produce Irving. Also, it must be borne in mind that Irving was allegedly unknown to defense counsel, and that neither had the Commonwealth indicated Irving was a witness to the alleged crime nor had it required Irving to be present in the courtroom.

Conversely, the Commonwealth asserts that even if it be decided that Irving was a germane witness who could have aided the Trial Court in reaching the truth, there was no infringement upon due process. The reasons therefor are, it is argued, that Drew's counsel had from Thursday morning to Monday afternoon, to ascertain the whereabouts of the witness and to subpoena him; [25] and that a few questions by defense counsel on cross examination of the narcotics officers, who testified for the prosecution, could have elicited information as to the whereabouts of Irving Carter. The Commonwealth maintains, accordingly, that the refusal to grant a continuance was proper.

Both in the Pennsylvania and Federal courts an application for a continuance is addressed to the sound discretion of the trial judge, whose ruling thereon the appellate court will leave undisturbed in the absence of an abuse of discretion.[26] As put by the District Judge the reason therefor is that the trial court is closest to the immediate situation, aware of all circumstances and conditions.[27] Again, it may thus be, that standing by itself, the denial of Drew's motion for the continuance to procure Irving did not violate the fundamental justice implicit in due process of law.

### 3. The Trial Court's Refusal to Grant the Defense a Continuance to Obtain the Testimony of the Alleged Alibi Witness, Thomas Sherwood.

It is apparent that counsel for Drew actually attempted to locate the alleged alibi witness, Sherwood. Finally, on the last day of trial counsel for Drew offered the telephone message from Mr. Wright for the purpose of demonstrating the good faith of his motion for a continuance to secure the testimony of the al-

22. Commonwealth v. Palermo, supra note 16, 368 Pa. at 33, 81 A.2d at 542; Commonwealth v. Giacobbe, supra note 16.

23. Commonwealth v. Karamarkovic, 218 Pa. 405 at 408, 67 A. 650 at 651 (1907); see Commonwealth v. Nicely, 130 Pa. 261 at 270, 18 A. 737 at 738 (1889), wherein Chief Justice Paxson said:
"It [the Commonwealth] seeks justice only,—equal and impartial justice,—and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escape. Hence, he should act impartially."

24. See supra note 16.

25. For authority holding that the Commonwealth need not produce essential testimony that is likewise available to the accused, see Commonwealth v. Stanley, 169 Pa.Super. 352 at 355–356, 82 A.2d 596 at 597–598 (1951) and Commonwealth v. Tauza, 300 Pa. 375 at 381, 150 A. 649 at 651 (1930).

26. Commonwealth v. Hicks, 173 Pa.Super. 395 at 397–398, 98 A.2d 478 at 479–480 (1953) and Franklin v. South Carolina, 218 U.S. 161 at 168, 30 S.Ct. 640 at 643, 54 L.Ed. 980 (1910), where the United States Supreme Court declared: "It is elementary that the matter of continuance rests in the sound discretion of the trial court, and its action in that respect is not ordinarily reviewable. It would take an extreme case to make the action of the trial court in such a case a denial of due process."

27. United States ex rel. Drew v. Myers, supra note 1, 214 F.Supp. at 457.

leged alibi witness. Also, he asserted that this was the first time the defense had been able to locate this witness. It would seem, therefore, that when the trial judge denied the motion for a continuance, Sherwood may have been within the defense's grasp.

But it should be remembered that the refusal to grant a continuance transgresses the guarantee of due process only in extreme cases.[28] A reasonable argument could be put forth, moreover, that through an earnest and aggressive investigation the defense could have obtained the alleged alibi witness in time for the trial.

If the Trial Court had permitted a continuance, it could have limited the time thereof. In addition, Pennsylvania had enacted the *Uniform Act to Secure Attendance of Witnesses*,[29] which provides a speedy and effective procedure, through the use of a certificate issued under the seal of the court, to summon witnesses living in another state.[30]

Harold Carter testified at the trial that he had never seen the accused prior to September 5, 1957—the date of the crime and then, according to the stipulation, for only "30 or 40 seconds". Under our system of law the opportunity to meet the prosecution's case with the aid of witnesses is historically and in practice fundamental to a fair trial.[31] Supported by Sherwood, the defense's assertion that the accused was in New York at the time of the alleged illegal transaction could have influenced the jury in favor of Drew. But, as with the prosecution's failure to disclose the presence of Irving Carter and the denial of the motion for a continuance to enable his production, the denial of this motion to obtain the alleged alibi witness, may not, in itself, have violated the fundamental justice implicit in due process of law.

As in all cases involving what is or is not due process, so in this case, no hard and fast rule can be laid down; rather, the pattern of due process must be picked out of the facts and circumstances of each case.[32] This case presents facts and circumstances which bring into reasonable dispute whether the cumulative effect of the alleged three injustices impinged upon petitioner's rights to fundamental justice guaranteed to him by the due process clause of the Fourteenth Amendment.

Title 28 U.S.C. § 2254 (1958)[33] simply requires, as a matter of national policy, that in the district court's exer-

---

28. Franklin v. South Carolina, supra note 26.

29. Purdon's Pa.Stat.Ann. tit. 19 §§ 622.1 to 622.7 (Supp.1962).

30. Purdon's Pa.Stat.Ann. tit. 19 § 622.3 (Supp.1962) which states:
 "*Witness from another state summoned to testify in this state*
 "If a person in any state which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions or grand jury investigations commenced or about to commence in this State is a material witness in a prosecution pending in a court of record in this State or in a grand jury investigation which has commenced or is about to commence, a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. Said certificate may include a recommendation that the witness be taken into immediate cus-

tody and delivered to an officer of this State to assure his attendance in this State. This certificate shall be presented to a judge of a court of record in the county in which the witness is found."
 Also, see 66 Pt. 2, McKinney's Laws of New York Ann., Code of Cr.Proc. § 618–a(2) (1958).

31. See MacKenna v. Ellis, 280 F.2d 592, 603 (5 Cir. 1960), modified in 5 Cir., 289 F.2d 928, cert. den. 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961).

32. Brock v. North Carolina, 344 U.S. 424, 427, 73 S.Ct. 349, 97 L.Ed. 456 (1953).

33. Section 2254 states:
 "§ 2254. *State custody; remedies in State Courts*
 "An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of avail-

cise of its power to entertain and dispose of petitions for habeas corpus, it shall not grant *affirmative relief* to a state prisoner until he has exhausted the remedies available in the state courts.[34] The reason for this restraint lies in the belief that the federal courts would avoid "unseemly collisions" by allowing the state courts first opportunity to review alleged state abuses of federal constitutional rights.[35]

■ The general grant of jurisdiction in habeas corpus,[36] which appears in Title 28 U.S.C. § 2241 (1958),[37] permits *denial* of a petition for the Great Writ on its merits, though state remedies may not be exhausted.[38] Manifestly, "it is not an indignity to state processes to assert that a claim of this sort [constitutional infringement] on its face or on a full record is clearly without merit." [39]

■ But here, Drew's claim of constitutional infringement is not clearly without merit. Rather, there is a reasonable dispute whether his constitution-

al safeguard of fundamental justice has been violated by the cumulative effect of (1) the Commonwealth's non-disclosure of Irving Carter's presence at the scene of the crime, (2) the denial of a continuance to allow defense counsel time in which to produce Irving, and (3) the denial of a continuance to secure the testimony of the alleged alibi witness, Sherwood.

Nothing in the record before us reveals that this issue was argued before, or decided by, any of the Pennsylvania state courts.[40] Accordingly, comity dictates that the Pennsylvania state courts first have an opportunity to rule thereon.[41]

The judgment of the United States District Court for the Eastern District of Pennsylvania dismissing the amended petition of Alfred W. Drew for habeas corpus will be affirmed, not on the grounds set forth by the District Court, but on the grounds that there has been a failure to show an exhaustion of state remedies as set forth herein.

able State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

See Habeas Corpus, Purdon's Pa.Stat. Ann. tit. 12, §§ 1871–1907, and Commonwealth ex rel. Norman v. Banmiller, 395 Pa. 232 at 235, 149 A.2d 881 at 882 (1959), which states: "However, where the record shows a trial * * * which was so fundamentally unfair as to amount to a denial of due process, or that some basic fundamental error was committed which deprived defendant of one of his constitutional rights, relief may be sought by habeas corpus."

34. In re Ernst, 294 F.2d 556, 561 (3 Cir. 1961), cert. den. 368 U.S. 917, 82 S.Ct. 198, 7 L.Ed.2d 132 (1961).

35. See concurring opinion in United States ex rel. Auld v. Warden of New Jersey State Penitentiary, 187 F.2d 615, 621 (3 Cir. 1951).

36. Id. 187 F.2d at 620.

37. Section 2241 states:
"§ 2241. *Power to grant writ.*
"(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had."
* * *
"(c) The writ of habeas corpus shall not extend to a prisoner unless—"
* * *
"(3) He is in custody in violation of the Constitution or laws or treaties of the United States; * * *."

38. In re Ernst, supra note 34, 294 F.2d at 561–562 and see United States ex rel. Darcey v. Handy, 203 F.2d 407, 421 (3 Cir. 1953) (opinion by Judge Maris).

39. United States ex rel. Auld v. Warden of New Jersey State Penitentiary, supra note 35.

40. Supra notes 6 to 10.

41. See Darr v. Burford, 339 U.S. 200, 204–208, 70 S.Ct. 587, 94 L.Ed. 761 (1950) and Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).